Filing # 105844865 E-Filed 04/03/2020 01:55:32 PM

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA

CASE NO.:
DIVISION:

**AMY GILLAND BRANTLEY**

      Plaintiff,

v.

**ALLERGAN SALES, LLC, a foreign
limited liability company, and
RICARDO E. MOJICA,**

      Defendants.

_____/

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

The Plaintiff, **AMY GILLAND BRANTLEY**, sues the Defendant, **ALLERGAN SALES, LLC, a foreign limited liability company**, and **RICARDO E. MOJICA**, and allege the following:

### GENERAL ALLEGATIONS

1.     This is an action for damages in excess of $30,000, exclusive of attorney's fees, costs, and interest.

2.     All conditions precedent to the filing of this action have been performed or have occurred.

3.     At all times material hereto, the Plaintiff, **AMY GILLAND BRANTLEY** (hereinafter "Ms. Brantley"), was and is a resident of, and permanently domiciled in Jacksonville, within Duval County, Florida.

4.      All medical care and treatment rendered to Ms. Brantley upon which the claims set forth herein are based took place in Jacksonville, Duval County, Florida.

5.      The Defendant, **ALLERGAN SALES, LLC** (hereinafter "Allergan"), is a foreign limited liability company, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

6.      Allergan is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit: researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

7.      Allergan may be reached for service of process in Florida through its registered agent, CT Corp. System, at 1200 South Pine Island Road, Plantation, Florida 33324.

8.      At all times material hereto, the Defendant, **RICARDO E. MOJICA** (hereinafter "Mojica") was and is a resident of, and permanently domiciled in, the State of Florida, to-wit, at 2425 Northwest 26th Street, Boca Raton, Palm Beach County, Florida.

9.      Allergan and Mojica's co-conspirators, whom Allergan and Mojica aided and abetted, were: (i).  Loren Z. Clayman, M.D. (hereinafter "Clayman Senior"); (ii).  his son, Mark A. Clayman, M.D. (hereinafter "Clayman Junior"); (iii).  and their medical professional association, Loren Z. Clayman, M.D., P.A. (hereinafter the "Clayman Practice"). Hereinafter, Allergan and Mojica's co-conspirators will be collectively referred to as the "Claymans".

## FACTUAL ALLEGATIONS

10.    For at least 15 years, Allergan has known that Clayman Senior, Clayman Junior, and the Clayman Practice were lying to hundreds of female patients by telling them they had ruptured, deflated, or leaking saline breast implants so the Clayman Practice could collect free implants and surgical fees for replacement surgeries.  Allergan knew the Claymans were lying because: (1). Allergan's own Southeast Regional Sales Director, Mojica, through the sales representatives working under him, first proposed to, and repeatedly encouraged, his Florida plastic and cosmetic surgery customers (including the Claymans) to lie to their patients and on breast implant warranty claim forms about the condition of saline implants in order to obtain free breast implants and a surgical fee; (2). as Allergan received a breast implant warranty claim form signed by the patient and Clayman Senior or Junior for each warranty claim made by the Clayman Practice, Allergan was aware that the Clayman Practice was lying to its patients about the condition of their breast implants; (3).  for each warranty claim made by the Clayman Practice, Allergan examined the implants at issue and found that they were not defective; and (4). the Clayman Practice's saline breast implant failure rate was markedly higher than the failure rate of 1.5% for each year after surgery that Allergan's own studies showed for the same implants.

Despite this knowledge, Allergan paid every saline breast implant warranty claim made by the Clayman Practice—5,278 claims—between January 1, 2006 and December 31, 2015. Allergan paid these claims because the Clayman Practice purchased large quantities of breast implants, other medical devices, and pharmaceuticals from Allergan, and Allergan wanted to encourage and promote the Clayman Practice's continued purchase of their products.  As demonstrated by the multiple criminal and civil proceedings against Allergan within the past 10

years, it is apparently an integral part of Allergan's marketing plan to pay (bribe) physicians to use its products. For these reasons, Allergan is liable to Ms. Brantley for aiding and abetting and conspiring with Clayman Senior, Clayman Junior, and/or the Clayman Practice.

### Allergan and McGhan/Inamed

11.    Donald K. McGhan worked at the laboratory where Dow Corning first made breast implants. In 1974, he founded McGhan Medical Corp., which began marketing silicone filled breast implants in 1975.

12.    In 1986, McGhan Medical Corp. merged with First America Corporation, changing its name to Inamed. The new company's breast implants were still labeled McGhan breast implants. By this time, the company was one of the largest breast implant manufacturers in the world.

13.    In March 2006, Inamed merged with Allergan, a multinational manufacturer of healthcare products in many different categories, including the following: dermatology, central nervous system, eye care, women's health and urology, gastroenterology, cardiovascular diseases, infectious diseases, and aesthetics. Among Allergan's products are Botox (therapeutic and aesthetic), Namenda, Restasis, Linzess, Bystolic, Juvederm, Latisse, Loestrin, Estrace Cream, Teflaro, Dalvance, Ozurdex, Optive, Viibryd, Liletta, and Saphris. After the merger with Inamed, McGhan Natrelle Saline Filled Breast Implants became known as "Allergan Natrelle Saline Filled Breast Implants."

4

### Allergan's Breast Implant Warranty Scheme

14.    After the merger, Allergan created Allergan Partnership Privileges (hereinafter "APP").[1]  APP provided members with rebates, sales growth rewards, a special online physician locator listing, priority customer service line access, preferred shipment status, and certificates and status displays; the purposes of APP was to leverage sales across its entire line of aesthetic products.  To become an APP Partner, a medical practice had to purchase at least three types of aesthetic products:  Botox (one of the company's most profitable products), a dermal filler (i.e., Juvederm), and breast implants.  APP had several tiers based upon the volume of Allergan aesthetic product purchases:  Bronze, Silver, Gold, Platinum, and Diamond; Diamond tier partners received the highest level of perks from Allergan.[2]

15.    Despite implementing the APP, in most regions Allergan's breast implants sales lagged behind those of its chief competitor, Mentor, which offered breast implants at lower prices.

16.    To increase the volume of breast implants sales, Allergan encouraged and approved regional sales directors in certain regions[3] to direct their sales representatives to expressly offer Diamond tier APP partners incentives that, crossing legal and ethical boundaries, *amounted to kickbacks and bribes*.  In some instances, they offered Diamond APP partners free travel and lavish non-educational parties in exchange for greater breast implant purchases.  In other instances, in exchange for increased breast implant purchases, representatives provided Diamond tier surgeons free implants and surgical fees by allowing them to make false breast implant warranty claims.

---

[1]    As of January 31, 2020, Allergan discontinued the APP.
[2]    Allergan later added another tier to the top level, Double Diamond.
[3]    Among the known regions where the warranty scheme was encouraged were Southern California, Colorado, and Florida.

17.     In the false warranty scheme, in exchange for higher breast implant purchases, Allergan's sales and marketing representatives (including Mojica and those working for him) expressly directed Diamond tier surgery practices (including the Claymans) to falsely claim implants had spontaneously ruptured, deflated, or leaked so they could receive free breast implants and surgical fees under the warranty.  One effect of this scheme was that it facilitated "cover ups" by certain surgeons who falsely attributed poor breast surgery outcomes to ruptured, deflated, or leaking implants rather than careless surgical practices.  As such, these surgeons were able to make more money from poor surgical practices, as Allergan increased its percentage of the breast implant market despite Mentor's lower prices.

## The Clayman Practice

18.     Clayman Senior was first licensed as a medical doctor in Florida on January 10, 1975.  On December 31, 1976, he completed a residency in plastic surgery, and he began practicing in Jacksonville, Florida.  Soon after establishing the Clayman Practice, he began performing breast augmentation surgeries.  During the 1980's, a substantial portion of the breast augmentation procedures he performed were with silicone filled breast implants.

19.     After the FDA prohibited the widespread use of silicone breast implants in 1992, Clayman Senior began using saline filled implants exclusively.

20.     As of the early 2000s, the Clayman Practice began marketing its breast augmentation practice to patients of modest means.  To reach this population, the Clayman Practice advertised extensively in free local discount publications.  Furthermore, the Clayman Practice began charging less for breast augmentations than other local plastic surgeon; while most plastic surgeons charged between $5,000 and $10,000, the Clayman Practice charged only

$3,750. As a result, the Clayman practice became a high-volume breast augmentation plastic surgery practice.

### Ricardo E. Mojica

21.    Between 2000 and 2006, Mojica worked as a surgical sales representative for Inamed/McGhan. The products he sold were breast implants, facial implants, and injectable "fillers."

22.    In 2002, Mojica was promoted to the Southeast Team Field Trainer.

23.    In 2003, Mojica was named "sales representative of the year" by Inamed/McGhan for achieving $1,040,000 in sales, which was an increase of 37% from the previous year.

24.    After the merger with Allergan, Mojica was promoted to Southeast Regional Sales Director, for which his territories included Florida, Georgia, and South Carolina. Mojica held this position between 2006 and 2013. According to his personal LinkedIn profile, he was "responsible for leading and developing an elite 10-member sales team," of which he claimed the "foundation of our success was achieved through a collaborative and synergistic team culture." He also attributes his success as the Southeast Regional Sales Director to "helping team members achieve their individual goals and open collaboration channels to share effective practices."

25.    In reality, Mojica trained and directed his sales representatives to act in ways that previous managers had prohibited. Specifically, he trained and directed them to expressly offer Diamond tier APP partners non-educational parties and travel in exchange for increased implant purchases. He also trained and directed them to employ the breast implant warranty scheme (see paragraphs 14-17). Specifically, sales representatives were trained and directed to expressly offer Diamond tier partners free breast implants and surgical fees for false warranty claims in exchange for higher breast implant purchases.

7

26.     Soon after adopting these unethical and illegal sales practices, Allergan's breast implant sales volumes increased rapidly in Mojica's region, particularly in Florida, even though Mentor continued to offer lower prices on implants.  As the volume of breast implant sales increased, the profit per pair of implants diminished, and the number of returned implants increased.

27.     In 2013, Mojica was promoted to Senior Director, Medical Education.  In his new position with Allergan, Mojica was responsible for "building and leading a high-performing team responsible for development of the plastic surgery sales force and plastic surgeons."  In this capacity, Mojica began training and directing sales representatives across the country to, among other things, employ the breast implant warranty scheme with Diamond tier partners.

### The Allergan/Mojica-Clayman Conspiracy

28.     Until the mid-2000s, the Clayman Practice purchased saline breast implants from Allergan's predecessor (Inamed/McGhan) *and Mentor*.  During this time, Clayman Senior began "covering up" his poor surgical practices by blaming post-augmentation complications on leaking, ruptured, or deflated implants.  Clayman Senior lied to his patients because he knew that by claiming that the implants were defective, he could divert blame for the complications away from himself.

29.     During a single year in the mid-2000s, the Clayman Practice made more than 40 warranty claims to Mentor.  In response, Mentor's quality assurance department contacted the regional sales manager and advised him that the high number of claims was indicative of fraud. Mentor asked the regional sales manager to meet with Clayman Senior and demand an explanation for the unusually high number of warranty claims.  Clayman Senior refused to meet with the sales manager.  As a result, Mentor permanently ended its relationship with the

Clayman Practice, and Inamed/McGhan became the Clayman Practice's sole breast implant supplier.

30.     After Allergan acquired Inamed/McGhan in 2006, the company adopted the APP and installed Mojica as the Sales Director for the Southeast Region, which included Jacksonville, Florida.  Soon afterward, the Clayman Practice became a Diamond tier partner in the APP as a result of its high-volume purchases of Allergan aesthetic products such as Botox, Juvaderm, and Natrelle saline breast implants.

31.     Mojica directed his sales representatives to expressly offer the Clayman Practice an opportunity to participate in the breast implant warranty scheme.  With that, the Claymans had found in Allergan, through Mojica and his sales representatives, a partner willing to assist them in defrauding their patients.  Thereafter, Allergan and the Claymans developed a symbiotic relationship built upon the mutual knowledge and understanding that the Claymans were lying to their patients about the condition of their breast implants to receive free breast implants and surgical fees in exchange for purchasing high volumes of aesthetic products from Allergan.

32.     Between 2006 and 2015 the Clayman Practice made the following warranty claims, for which Allergan made the following payments:

| Year | Warranty Claims | Warranty Payments to the Clayman Practice |
|------|-----------------|-------------------------------------------|
| 2006 | 84  | $  106,800 |
| 2007 | 76  | $  110,400 |
| 2008 | 150 | $  213,600 |
| 2009 | 261 | $  261,000 |
| 2010 | 521 | $  855,600 |
| 2011 | 866 | $1,420,000 |

9

| 2012 | 849 | $1,380,000 |
| 2013 | 798 | $1,330,000 |
| 2014 | 1,057 | $1,770,000 |
| 2015 | 616 | $1,090,000[4] |

33.    To make a breast implant warranty claim, surgery practices were required to return "defective implants" to Allergan, where members of the product surveillance department performed what they called *Laboratory Analyses*, a series of tests designed to identify root causes of ruptures, deflations, or leaks.  The product surveillance department would then generate *Laboratory Analysis* reports detailing their findings.[5]

34.    Nearly every *Laboratory Analysis* report for saline breast implants returned by the Clayman Practice found no evidence of a "loss of shell integrity, resulting in implant rupture or deflation," which was a requirement for payment under Allergan's warranty.  Nevertheless, Allergan paid every warranty claim from the Clayman Practice between 2006 and 2015; this amounted to **5,278 warranty claims for a total of $8,537,400 in payments.**

35.    Allergan's own studies of its saline breast implants showed a failure rate that was markedly lower than the failure rate experienced by the Clayman Practice.  According to this study, the failure rate for Allergan Natrelle saline breast implants was only 1.5% for each year after surgery.

36.    Allergan has had a deep financial motivation for paying the Clayman Practice's 5,278 warranty claims.  Between January 1, 2008 and December 31, 2015, the Clayman Practice

---

[4]    The undersigned does not have records reflecting the number of breast implant warranty claims the Clayman Practice made to Allergan after 2015.

[5]    One important reason the Allergan-Clayman conspiracy went undiscovered for so many years was that Allergan did not as a matter of course provide patients with copies of their *Laboratory Analysis* reports.

purchased 11,082 pairs of saline breast implants from Allergan, which made the Clayman Practice one of Allergan's top 10 breast implant customers in Florida. Furthermore, the Clayman Practice purchased a host of other aesthetic products from Allergan, including the following: Botox, Latisse, Juvederm, Kybella, SkinMedica, Vivate, and CoolSculpting (a product marketed by Zeltiq Aesthetics, which is a subsidiary of Allergan). Since Allergan adopted the APP, the Clayman Practice has essentially become a "one supplier shop." When a nurse employed by the Clayman Practice asked Clayman Senior why he believed Allergan would keep paying his breast implant warranty claims, he told her, "I know they're going to pay them all because I'm a Diamond level partner."

37.    During this same time period, other plastic surgery practices that were not APP Diamond tier partners had their saline breast implant warranty claims denied by Allergan, even though they made fewer than five warranty claims per year.

38.    Furthermore, to the best of the undersigned's information and belief, Allergan has devised an "off-balance-sheet" method of paying breast implant warranty claims. Specifically, Allergan pays breast implant warranty claims through a captive insurance company created and owned by Allergan.[6]  When a manufacturer such as Allergan creates a captive insurance company, the manufacturer is provided a means of reclassifying otherwise taxable income from across its various divisions and subsidiaries as "premium payments" that go to the captive insurance company. The formerly taxable income that is reclassified as "premiums" then accumulates within the captive, making it, essentially, a large "slush fund." In the event the manufacturer uses the captive insurance company to pay a "loss," such as a breast implant warranty payment, the loss is not reflected in the manufacturer's balance sheets or filings with

---

[6]      *See*, https://opencorporates.com/companies/us_hi/206243D1.

the Securities and Exchange Commission. In addition, because the captive is not a third-party

company, manufacturers with captive insurance companies are free to manipulate the claims

process without outside interference.

### Allergan's Similar Course of Conduct Across Other Divisions

39.     The breast implant warranty scheme is not the first instance in which Allergan has

been implicated in a physician bribery scheme, as Allergan has been implicated in violations of

the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), <u>at least six times, resulting in Allergan</u>

<u>paying a total of $1.089 billion</u> in criminal penalties and civil settlements.

40.     The federal Anti-Kickback Statute prohibits anyone from

> knowingly and willfully offer[ing] or pay[ing] remuneration (including any
> kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in
> kind to any person to induce such person—
>
>      …
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing,
> leasing, or ordering any good, facility, service, or item for which payment
> may be made in whole or in part under a Federal health care program[7]…

42 U.S.C. §1320a-7b(b)(2).

41.     Over the past ten years, Allergan was involved in the following:

A.     **September 1, 2010,** Allergan was forced to pay $600 million in settlement

of criminal and civil complaints that included allegations of providing free physician

workshops and dinners, paying physicians to attend "advisory boards" promoting off-

---

[7]     Because the Clayman Practice's patients paid for their breast augmentation procedures
with cash (not under a Federal health care program), the Anti-Kickback Statute does not apply to
the Clayman scheme, and Plaintiff asserts no claim under the Anti-Kickback Statute. Plaintiff,
however, alleges the facts concerning Allergan's conduct in violation of the Anti-Kickback
Statute to show this Court that it is plausible that Allergan, consistent with its past criminal
conduct, engaged here in criminal conduct by conspiring with, and substantially assisting, the
Clayman Practice to perpetrate fraud upon its patients.

label uses, and created Alphamedica, which administered a speakers bureau that paid physicians $1,000 to allow sales representatives to shadow them at work.[8]

B.   **September 15, 2010**, Allergan's Forest Laboratories division was forced to pay a $313 million settlement of criminal and civil complaints that included allegations of cash payments to physicians that the company described as "grants" and "consulting fees," expensive meals, and lavish entertainment to physicians to induce them to prescribe the drugs Celexa and Lexapro.[9]

C.   **October 29, 2015**, Allergan's Warner Chilcott division was forced to pay a $125 million settlement in a case that included allegations of violations of paying doctors speaking fees to induce them to prescribe the drugs Asacol, Actonel, and Loestrin.[10]

D.   **December 15, 2016**, Allergan's Forest Laboratories division was forced to pay a $38 million settlement in a case that included allegations of paying kickbacks to physicians to induce them to prescribe the drugs Bystolic, Savella, and Namenda.[11]

E.   **June 29, 2017**, Allergan was forced to pay a $13 million settlement in a case involving allegations of providing valuable business consulting services, continuing medical education, and other valuable services to physicians to induce them to prescribe

---

[8]   *See,*   https://www.justice.gov/opa/pr/allergan-agrees-plead-guilty-and-pay-600-million-resolve-allegations-label-promotion-botox;   https://www.cbsnews.com/news/how-allergan-sponsored-a-history-of-sausages-to-promote-botox-illegally/.

[9]   *See,*   https://www.justice.gov/opa/pr/drug-maker-forest-pleads-guilty-pay-more-313-million-resolve-criminal-charges-and-false.

[10]   *See,* https://www.wsj.com/articles/allergan-unit-to-plead-guilty-to-fraud-pay-125-million-1446139657/?mod=mktw.

[11]   *See,*   https://www.justice.gov/opa/pr/forest-laboratories-and-forest-pharmaceuticals-pay-38-million-resolve-kickback-allegations.

13

Allergan eye care products including Restasis, when other less expensive treatment alternatives were available.[12]

42.    Allergan's previous conduct demonstrates that its involvement in the breast implant warranty scheme was and is part of a larger course of conduct whereby the company's marketing plan includes bribing physicians to increase sales.

**Amy Gilland Brantley**

43.    Ms. Brantley initially sought a consultation for breast augmentation from the Claymans on January 7, 2014. She indicated that after nursing two children she wanted a fuller and more youthful set of breasts.

44.    On January 31, 2014, Clayman Senior performed a bilateral breast implant on Ms. Brantley. The Operative Report indicates that Clayman Senior inserted Allergan HP 400cc saline breast implants, bilaterally. The records do not specify the fill level.

*First Revision*

45.    Ms. Brantley returned to the Claymans with concerns the following month. She was not satisfied with her breast implants due to the size disparity between her breasts. On April 18, 2014, a cost estimate was prepared, and it indicated that there was no cost to her. Ms. Brantley was told that all costs, other than a $200 warranty purchase, would be waived for her because Allergan would cover the cost of the implant and surgery.

46.    Ms. Brantley returned for her first revision surgery on May 23, 2014. The Claymans had Ms. Brantley sign an informed consent form that indicated she had a deflation with her left breast implant for which she needed a bilateral removal and replacement surgery. A

---

[12]    *See*, http://www.pietragallo.com/library/files/nevyas_allergan_press_release_final.pdf.

preoperative photograph taken that day by the Claymans demonstrates, however, that Ms. Brantley did not have a deflation with either of her breast implants.

47.     The Operative Report reflects that she was diagnosed with a "left deflation." The OR Record indicates that Clayman Senior dissected down to the left implant, and he claims there was "tissue in valve." The left implant was then removed. The right implant was found intact and removed nonetheless.

48.     Clayman Senior replaced both of the previous implants with Allergan HP 400cc saline implants. The records do not specify the fill level. According to the OR Record, the entire procedure took only 20 minutes to complete.

49.     On May 23, 2014, the Claymans had Ms. Brantley sign warranty claim documents indicating that her left implant had a defect. After performing a *Laboratory Analysis*, Allergan found no evidence of a "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention." Despite this finding, Allergan still paid the Claymans the sum of $2,400.

50.     At the time Allergan received the warranty claim made by the Claymans, on or about May 23, 2014, Allergan had already received over a thousand warranty claims from the Claymans for saline breast implants that Allergan knew did not demonstrate a "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention."

*Second Revision*

51.     In July 2014, Ms. Brantley was still having trouble with her implants as her breasts were still misshapen and uneven. A cost estimate was prepared on July 29, 2014, and it indicated that there was no cost to her. She was told that all costs, other than a $200 warranty

purchase, would be waived for her because Allergan would cover the cost of the implant and surgery.

52.    Ms. Brantley returned for her second revision surgery on August 14, 2014. The Claymans had Ms. Brantley sign an informed consent form that indicated she had another "left deflation" for which she needed a bilateral removal and replacement surgery. However, Ms. Brantley did not have a spontaneous rupture, deflation, or leak at either of her breast implants. A preoperative photograph taken that day by the Claymans demonstrates the same.

53.    The Operative Report reflects that she was diagnosed with a "left deflation." The OR Record indicates that Clayman Senior dissected down to the left implant, and it was found to have "tissue in valve/leak in valve." The left implant was then removed. The right implant was found intact and removed nonetheless.

54.    Clayman Senior replaced both of the previous implants with Allergan MP 390cc saline implants. The records do not specify the fill level.

55.    On August 14, 2014, the Claymans had Ms. Brantley sign warranty claim documents indicating that her left implant had a defect. After performing a *Laboratory Analysis*, Allergan found no evidence of a "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention." Despite this finding, Allergan still paid the Claymans the sum of $2,400.

### *After Care*

56.    Ms. Brantley ultimately left the care of the Claymans. After two revision surgeries at the hands of the Claymans, Ms. Brantley's breasts and implants remain malpositioned, asymmetrical, extremely painful, and have a poor aesthetic appearance. She has significant scarring and tissue damage.

57.     By August 2017, Ms. Brantley sought a second opinion from a different plastic surgeon.  The new doctor noted the asymmetry, extra firmness in only the left breast, and a noticeable scar on the right breast.  The doctor also recommended that silicone implants would have been more appropriate for Ms. Brantley.  On October 2, 2017, she received corrective bilateral surgery, which replaced her saline implants with silicone implants.

### COUNT I – ALLERGAN AND MOJICA AIDING AND ABETTING THE CLAYMANS' BREACH OF FIDUCIARY DUTY AND/OR FRAUD

58.     Ms. Brantley re-alleges and incorporates by reference paragraphs 1 through 57.

59.     Throughout the care and treatment of Ms. Brantley, the Claymans breached their fiduciary duty to her by:

(a).     Recommending or insisting on Allergan saline implants based on their direct financial motivation, rather than making appropriate recommendations based on the best interests of the patient.

(b).     Claiming that one or more of her breast implants had ruptured, deflated, or leaked when they had not.

(c).     Operating on Ms. Brantley on May 23, 2014, and August 14, 2014 ("the Two Revision Surgeries"), based on alleged implant ruptures, deflations, or leaks that did not exist, which placed her at an increased risk for surgical and anesthetic complications, and which involved simply repeating the same procedure that was previously performed.

(d).     Not performing the surgery that her physical condition actually required, in favor of surgery that took less time and skill, to allow for the removal and replacement of Allergan Natrelle saline implants under the warranty.

(e).    Operating on Ms. Brantley for the Two Revision Surgeries to address alleged implant deflations so that Clayman Senior and Junior and/or the Clayman Practice would recover a surgical fee from Allergan under the warranty.

60.    On one or more of the below occasions, the Claymans made the following false statements or representations, which were intended to conceal their financial and other personal motivations in connection with the removal and replacement of allegedly ruptured, deflated, or leaking Allergan Natrelle saline implants, and which in fact misled Ms. Brantley and/or caused her to respond in the following ways to her detriment:

(a).    Prior to each of the Two Revision Surgeries, Clayman Senior told Ms. Brantley that one of her breast implants was deflated and needed to be replaced. In fact, Ms. Brantley did not have an implant deflation, rupture, or leak, and they did not have the intention or ability to correct the actual problems with her breasts. These representations caused Ms. Brantley to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant; these representations also caused her to agree to have additional surgeries by Clayman Senior instead of a different plastic surgeon. As a result, Ms. Brantley did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(b).    In a surgical estimate prepared for each of the Two Revision Surgeries, Clayman Senior represented to Ms. Brantley that one of her breast implants was deflated and needed to be replaced. In fact, Ms. Brantley did not have a breast implant deflation, rupture, or leak, and they did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Brantley to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant; these

representations also caused her to agree to have additional surgeries by Clayman Senior instead of a different plastic surgeon.  As a result, Ms. Brantley did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

      (c).    In the informed consent form for each of the Two Revision Surgeries, Clayman Senior represented to Ms. Brantley that one of her breast implants was deflated and needed to be replaced. In fact, Ms. Brantley did not have a deflation, rupture, or leak of her implant, and they did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Brantley to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant; these representations also caused her to agree to have additional surgeries by Clayman Senior instead of a different plastic surgeon.  As a result, Ms. Brantley did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

      (d).    In the Operative Report and OR Record for each of the Two Revision Surgeries, Clayman Senior represented to Ms. Brantley that one of her breast implants had a rupture, deflation, or leak and needed to be replaced. In fact, Ms. Brantley did not have a rupture, deflation, or leak of her breast implant, and they did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Brantley to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant; these representations also caused her to agree to have additional surgeries by Clayman Senior instead of a different plastic surgeon.  As a result,

Ms. Brantley did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(e).     On or about the time of the Two Revision Surgeries, the Claymans made a warranty claim to Allergan regarding the breast implant(s) removed during the respective surgery.  Specifically, Clayman Senior had Ms. Brantley sign a warranty claim form for each surgery indicating that she had a rupture, deflation, or leak with one of her breast implants for which she needed a removal and replacement procedure.  By having Ms. Brantley sign this claim form, the Claymans represented to her that her breast implant was ruptured, deflated, or leaking and needed to be replaced.  In fact, Ms. Brantley did not have a rupture, deflation, or leak of her breast implant, and they did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Brantley to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant; these representations also caused her to agree to have additional surgeries by Clayman Senior instead of a different plastic surgeon.  As a result, Ms. Brantley did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

61.     For the previously stated reasons in paragraphs 30 through 38 above, Allergan and Mojica knew that the Claymans were breaching a fiduciary duty owed to Ms. Brantley, and/or committing fraud upon her.  Despite this knowledge, Allergan and Mojica provided substantial assistance to the Claymans in committing fraud against Ms. Brantley, and/or breaching a fiduciary duty owed to Ms. Brantley, in one or more of the following ways:

(a).     Continuing to sell saline breast implants to the Claymans while Ms. Brantley was a patient of the Claymans; and

(b).     Ensuring payment of the warranty claim of the Claymans in relation to the Natrelle saline filled breast implants that Clayman Senior placed into Ms. Brantley at various times, and which Clayman Senior surgically removed during the Two Revision Surgeries.

62.     As a direct and proximate result of the substantial assistance provided by Allergan and Mojica to the Claymans, Ms. Brantley suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

63.     Furthermore, as a direct and proximate result of the above noted substantial assistance provided by Allergan and Mojica to the Claymans, Ms. Brantley has spent monies in the amount of approximately $3,750 or more, for medical and/or surgical care by the Claymans that was of no value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff, **KELLIE ELAINE BRANTLEY,** demands judgment for compensatory and punitive damages against the Defendants, **ALLERGAN SALES, LLC** and **RICARDO E. MOJICA,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

### COUNT II – ALLERGAN, MOJICA, AND THE CLAYMANS' CONSPIRACY TO COMMIT BREACH OF FIDUCIARY DUTY AND/OR FRAUD

64.     Ms. Brantley re-alleges and incorporates by reference paragraphs 1 through 57, 59 and 60.

21

65.     On or before October 6, 2010, Allergan, Mojica, and the Claymans entered into an agreement to commit one or more breaches of a fiduciary duty and/or fraud in relation to the Claymans' patients.  The acts and conduct illustrative of the parties' intent to enter into this agreement are alleged in paragraphs 30 through 38 above.  Furthermore, Mojica had a personal stake in the activities of the conspiracy that was separate from Allergan's interests in the conspiracy, i.e. his personal advancement within the company and individual incentive pay and/or commissions.

66.     Allergan and Mojica committed one or more of the following overt acts in furtherance of the conspiracy to breach a fiduciary duty and/or to commit fraud:

(a).     Continuing to sell saline breast implants to the Claymans while Ms. Brantley was a patient of the Claymans; and

(b).     Paying the warranty claim of the Claymans in relation to the Natrelle saline filled breast implant that Clayman Senior placed into Ms. Brantley at various times, and which Clayman Senior surgically removed during the Two Revision Surgeries.

67.     As a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty, Ms. Brantley suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

68.     Furthermore, as a direct and proximate result of the above noted conspiracy to breach a fiduciary duty and/or to commit fraud, Ms. Brantley has spent monies in the amount of $3,750 or more, for medical and/or surgical care by Clayman Senior and/or the Clayman Practice

that was of no value, and which has caused her to have to incur future medical expenses to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff, **KELLIE ELAINE BRANTLEY**, demands judgment for compensatory and punitive damages against the Defendants, **ALLERGAN SALES, LLC** and **RICARDO E. MOJICA**, together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT III – FLORIDA CIVIL RICO AND REMEDIES
## FOR CRIMINAL ACTIVITIES – CONSPIRACY

69.    Ms. Brantley re-alleges and incorporates by reference paragraphs 1 through 57, 59 and 60.

70.    Allergan and Mojica violated sections 772.103(4) and 895.04(4), *Florida Statutes*, by conspiring with the Claymans to violate sections 772.103(3) and 895.03(3), respectively.

71.    In connection with the fraudulent scheme, Allergan, Mojica, and the Claymans agreed to accomplish an unlawful plan to engage in a pattern of criminal and racketeering activity.

72.    Allergan, Mojica, and the Claymans agreed to the overall objective of the conspiracy, or they agreed to commit personally at least two acts of criminal and racketeering activity.

73.    The predicate acts of Allergan, Mojica, and/or the Claymans began at an unknown date, and involved hundreds of the Claymans' breast implant patients.

74.    The predicate acts of Allergan, Mojica, Elana Clayman, and/or the Claymans continued to occur against the Claymans' breast implant patients at least until October 26, 2017.

75.    As a direct and proximate result of the predicate acts taken in furtherance of the conspiracy, Ms. Brantley suffered bodily injury and resulting pain and suffering, mental anguish,

23

disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

76.     Furthermore, as a direct and proximate result of the predicate acts taken in furtherance of the conspiracy, Ms. Brantley has spent monies in the amount of $3,750 or more, for medical and/or surgical care by Clayman Senior and/or the Clayman Practice that was of no value, and which has caused her to have to incur future medical expenses to correct the damages done by said medical and/or surgical care.

77.     Despite her diligence and efforts, Ms. Brantley's discovery of these ongoing injuries was delayed by Allergan, Mojica, and/or the Claymans' fraudulent concealment activity.

78.     Pursuant to section 772.104, *Florida Statutes*, Ms. Brantley is entitled to recover treble damages plus costs and attorney's fees from Allergan and Mojica.

WHEREFORE, the Plaintiff, **AMY GILLAND BRANTLEY**, pursuant to Section 895.05, *Florida Statutes*, demands judgment for treble actual and consequential damages arising from the conduct of the Defendants, **ALLERGAN SALES, LLC** and **RICARDO E. MOJICA**, an award of costs and all reasonable attorneys' fees, and the following additional remedies:

A.     A preliminary injunction prohibiting similar conduct by the Defendants in the State of Florida;

B.     A permanent injunction prohibiting similar conduct by the Defendants in the State of Florida;

C.     Revocation of the certificate authorizing the Defendant, **ALLERGAN SALES, LLC**, to do business in the State of Florida;

D.      Forfeiture of all monies and real and personal property received or obtained by the Defendants as a result of the acts alleged in this Count, and the Plaintiff, **AMY GILLAND BRANTLEY**, will have a claim for any and all such forfeited monies and real and personal property;

E.      A civil penalty against the Defendant, **RICARDO E. MOJICA**, in the amount of $100,000;

F.      A civil penalty against the Defendant, **ALLERGAN SALES, LLC**, in the amount of $1,000,000; and

G.      Any further relief the Court deems just and proper.

Dated this 3rd day of April, 2020.

/s/ Christopher Shakib_____
**Christopher Shakib, Esquire**
Florida Bar No.: 0947865
**Bradley Bodiford, Esquire**
Florida Bar No.: 0084897
**TERRELL HOGAN & YEGELWEL, P.A.**
233 East Bay Street, 8th Floor
Jacksonville, Florida 32202
Telephone: (904) 632-2424
Facsimile: (904) 632-5049
Primary Email: shakib@terrellhogan.com
Primary Email: bodiford@terrellhogan.com
Secondary Email: jfleury@terrellhogan.com
Attorneys for the Plaintiff